## SOUTHERN COTTONSEED OIL COMPANY *v.* EDWARDS, SIMMONS & COMPANY.

1. One who, without consideration, merely agrees to place another in possession of property, is in no legal sense a lessor ; nor can he be held liable as such if, through no fault of his own, the person to whom he yields possession of the property is afterwards deprived of the use and enjoyment thereof.
2. In no view of the facts brought to light on the trial of the present case were the defendants entitled to a finding in their favor.

Argued June 20, — Decided July 20, 1901.

Complaint.    Before Charles L. Bass, judge pro hac vice.    City court of Clarkesville.    October 19, 1900.

*C. H. Sutton* and *King & Spalding*, for plaintiff.
*George P. Erwin* and *Robert McMillan*, for defendants.

LUMPKIN, P. J.    The Southern Cottonseed Oil Company brought an action against Edwards, Simmons & Company and the individuals composing that firm, to recover a certain amount of money alleged to have been advanced to it for a specified purpose, and for which the defendants had failed to account.  They filed an answer in which they admitted that this sum had been advanced to them, but denied that they were liable to account therefor.  Their defense was, in substance, as follows : The plaintiff and certain other companies entered into a contract with the defendants, by the terms of which they were to buy cottonseed to be shipped to and resold to these companies.    "It was agreed, among other things, that these defendants were to be furnished by petitioner with a wagon scale on which to weigh seed, which said scale was at that time located in Toccoa and near defendants' place of doing business."    They were to "furnish all the necessary help, labor, etc., in representing petitioner and in purchasing seed for [it] at Toccoa, and were to receive a profit on seed so bought."  The money advanced to them "was furnished defendants under said contract and for the purpose of carrying out the same."    They "undertook in good faith to carry out the provisions of said contract, and engaged and employed one additional clerk at a cost of $100, and rented a warehouse to store seed at a cost of $50," and also "made all the necessary arrangements and prepared to purchase and handle large quantities of cottonseed, and could and would have purchased and handled several thousand

bushels of cottonseed," had the plaintiff not "failed and refused to furnish the scales to weigh such seed." After the above-mentioned contract was entered into, the plaintiff "took and carried away the scales that [it] had in town and had contracted and agreed that defendants should use." As a result, it was "impossible for defendants to purchase cottonseed," and they suffered damages, not only to the extent above indicated, but in "the further sum of one hundred and fifty dollars as profit on cottonseed." They therefore sought, by way of recoupment, to recover the damages thus sustained. The trial of the case resulted in a verdict in favor of the defendants, and the company made a motion for a new trial, which was overruled, and it excepted. The questions presented for our decision will be fully covered by the brief discussion which follows.

1. A copy of the contract referred to in the answer filed in behalf of the defendants appears in the record before us. It recited that: "This agreement between the Southern Cotton Oil Company, Georgia Cotton Oil Company, Gate City Cotton Oil Company, of Atlanta, Ga., and Elberton Oil Mills, and Edwards, Simmons & Co., of Toccoa, is as follows: So. Cotton Oil Company, Gate City Oil Company, Georgia Cotton Oil Co., Elberton Oil Mills, place their wagon scales in the possession of Edwards, Simmons & Co., only for the purpose of weighing cottonseed, to be shipped to said Southern Cotton Oil Co., Gate City Oil Co., Georgia Cottonseed Oil Co., Elberton Oil Mills. It is agreed and understood that all cottonseed so weighed on said scales belonging to said oil company shall be shipped to said oil companies at the prices named to said Edwards, Simmons & Co., at the time said seed were purchased from the seed raisers. Any violation by Edwards, Simmons & Co. will be considered a cancellation of agreement, and the said oil companies will have the right to take possession of wagon scales without any further notice. This agreement can be terminated by either party giving the other ten days notice of their intention to cancel the same." The contract purported to have been signed by an authorized agent of the oil companies on August 23, 1897, and under his signature appeared the following: "Mem. Will allow $12\frac{1}{2}$ cents pr. ton for use of house." It is to be noted that this writing embraced no covenant on the part of the Southern Cotton Oil Co., whereby it either expressly or by necessary implication obligated itself to keep Edwards, Simmons & Co. at all times supplied

with suitable scales upon which to weigh such cottonseed as they might buy. On the contrary, reference was had exclusively to particular wagon scales already erected, which may or may not have been suitable, and which the oil companies agreed simply to "place" in the possession of that firm "only for the purpose of weighing cottonseed to be shipped to" them. Evidently it was not contemplated that Edwards, Simmons & Co. should be regarded as technical lessees of the oil companies, and, as such, entitled to absolute control over these scales for any definite term or at any fixed rental. Indeed there is no suggestion that the oil companies undertook, as lessors, to warrant their title thereto or to guarantee that they had a right to maintain the same at the points at which they were located, or that Edwards, Simmons & Co. would be kept in undisturbed possession thereof. The agreement entered into was exceedingly loose and general in its terms. The oil companies did not obligate themselves to take any given quantity of seed, at any specified price, nor did Edwards, Simmons & Co. assume any binding obligation to purchase and resell to them a single pound of seed. Furthermore, the agreement was subject to cancellation t any time "by either party giving the other ten days notice of their intention to cancel same." No reasonable inference can therefore arise that the oil companies undertook to do more than "place their wagon scales in the possession of Edwards, Simmons &Co.," and thereby confer upon that firm the privilege of exercising whatever rights they might have with respect to the use and enjyment of the same. In view of the fact that Edwards, Simmos & Co. entered into no binding obligation to actually buy and shipto the oil companies any seed at all, it is obvious that there was absqutely no consideration for a promise on their part to do even this much; and unless they declined to yield possession of the scale or, after duly surrendering possession thereof, wrongfully deprivecEdwards, Simmons & Co. of the use of the same, they could not july be charged with a failure to meet their moral obligations in the remises.

2. A matter of fact, the Southern Cottonseed Oil Co. actually placed te defendants in possession of its wagon scales at Toccoa. Subsequitly they were condemned by the town authorities, and the deferants wrote a letter to the company in which it was notified of the occurrence. The company "sent a man up to see about

the matter." He employed the defendants to "take up" its scales "and ship them to Atlanta." This they did, and the company paid them for their services. One of the defendants was sworn as a witness on the trial, and testified, in this connection, as follows: "The scales in front of our store belonged to plaintiff and were to be used by us, but were condemned by town authorities; and with the understanding that we were to use those in front of our warehouse on R. R. right of way belonging to Elberton Mills, a party to the contract, we, at request of plaintiff, shipped the scales to them. When we went to weigh on Elberton scales, found Ramsey and Scaefer using them; . . and when we wanted to use them, were forbidden by Ramsey and Scaefer." The witness did not, however, state that either the plaintiff or its agent was a party to this "understanding," or was responsible for the conduct of Ramsey and Scaefer (whoever they may have been) in preventing the defendants from using the scales which belonged to the Elberton Mills. The plaintiff introduced the testimony of its agent, taken by interrogatories, who testified: "I arranged with defendants to take up scales and ship them. Defendants said they would have no use for them; they could weigh on other scales they had a right to use. Defendants said scales ought to be removed, as the town council had so ordered." They interposed no objection, but "took job of removal," saying they would "not need scales for season 1897." It is a matter worthy of comment that the defendants did not undertake to meet this testimony by offering to prove that in point of fact, they did not make the statements concerning which this witness testified, but agreed to the removal of the scales only upon an express undertaking by him, or his principal, that the scales belonging to the Elberton Mills should be placed at their disposal.

Furthermore, there was no evidence before the jury upon which it could properly base an estimate of the amount of damages, if any, which the defendants sustained by reason of their being deprived of the use of the scales belonging to the plaintiff. There was no proof whatever concerning their alleged loss of profits. They did not in fact, as stated in their answer, rent "a warehouse to store seed, at a cost of $50." They already had one, and merely "partitioned off one corner or part of it and reserved it for holding cottonseed." What expense, or loss, was thus incurred was not shown, nor did it appear what was the rental value of the corner

so reserved.  It is true they "hired an extra clerk to help weigh seed, at $100 per year."  But, in view of the terms of the written contract upon the faith of which they acted, they had no right to assume that they would necessarily need his services for that period. As has been seen, that contract contained an express stipulation to the effect that, upon giving ten days notice of an intention to cancel the agreement entered into, the plaintiff could at its pleasure terminate the same.  Moreover, the defendants introduced no evidence tending to show that, by reason of their having no need of this clerk's services after the company's alleged breach of its contract, they really lost anything; or, if so, how much.  For aught that appears, he may have performed in their behalf, during the year for which he was employed, services the value of which was far in excess of the salary they obligated themselves to pay him; or, upon finding that his services were no longer needed, he may have voluntarily elected not to hold them to their contract to give him employment for a year.  On the whole, we are forced to the conclusion that in no view of the case can the finding in favor of the defendants be legally upheld.

*Judgment reversed.  All the Justices concurring.*